UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-20555-CR-GAYLES

UNITED STATES OF AMERICA

v.

ANTHONY P. BOSCH,

     Defendant.

_____/

## MOTION FOR SIX MONTH DOWNWARD DEPARTURE/VARIANCE AND MEMORANDUM IN AID OF SENTENCING

Defendant Anthony Bosch, through undersigned counsel, respectfully files his Motion for a Modest Downward Departure and/or Variance from the advisory sentencing guidelines and submits this Memorandum in Aid of Sentencing, pursuant to U.S.S.G. § 5K1.1, 18 U.S.C. § 3553(a) and Local Rule 88.8(b), stating:

### INTRODUCTION

On October 16, 2014, Anthony Bosch pled guilty to a single-count Information charging him with conspiracy to distribute testosterone, in violation of Title 21, U.S.C. § 841(a)(1).  In so doing, Mr. Bosch accepts complete responsibility for participating in the distribution of testosterone, a Schedule III substance.

Mr. Bosch did not set out to harm the individuals that sought his help.  Indeed, that was never his intent.  To the contrary, he started out with the simple desire to follow in the footsteps of his father, a doctor.  It was Tony Bosch's desire to complete medical school, become a doctor, and try to help people.  His passion for sports eventually intersected with his years of medical training and education.   He began building a legitimate, successful business focused on

**Lewis Tein** PL
ATTORNEYS AT LAW

3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

educating individuals as to health, nutrition, and performance.  As his business grew, he began to meet and treat professional athletes and clients who willingly sought his services.  Mr. Bosch continued to be blessed with success.  Unfortunately, the professional and personal pressures he put on himself led to sporadic, recreational drug use.  Even more unfortunate, his sporadic, recreational drug use eventually evolved into an addition.  As this happened, his life devolved, and prior to his arrest eventually spiraled out of control.  For this he is deeply sorry to the Court, to his family, and to the government.

### THE SENTENCING PROCESS

It is almost ten years since the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005).  Since *Booker*, it has become well-established that district courts make an "individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 50 (2007).

In 2013, the United States Supreme Court reaffirmed what has become the hallmark of current federal sentencing practice—reasoned judicial discretion based on the individual circumstances of each case.  *See, e.g.*, *Peugh v. United States*, 569 U.S. ___, 133 S. Ct. 2072, 2079-80 (2003).  Indeed, "a district court's decision to vary from the advisory Guidelines may attract greatest respect when 'it is based on the particular facts of the case.'"  *Peugh*, 133 S. Ct. at 2080 (quoting *Kimbaugh v. United States*, 553 U.S. 85, 109 (2007)).  Although the guidelines are now merely advisory, the provisions under § 3553(a) are mandatory and contain an overarching provision instructing district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing under that provision.  *Kimbaugh*, 553 U.S. at 101.

2

According to *Gall*, the Court must impose a sentence that is both procedurally and substantively reasonable. *Gall*, 552 U.S. at 51. For a sentence to be procedurally sound the Court must correctly calculate the advisory guideline range, treat the guidelines as advisory, consider all the factors set forth in 18 U.S.C. § 3553(a), set forth factual findings on the record, and provide an adequate explanation for the sentence imposed. *Id.* To fashion a substantially reasonable sentence, the Court has considerable discretion as to the weight of each of the § 3553(a) factors. As a result, the applicable advisory guideline range is only one of the may co-equal factors listed in § 3553(a) that the Court must consider. *Id.*

Less than five years ago, United States Attorney General Holder issued a revised "Department Policy on Charging and Sentencing." *See* Mem. to All Federal Prosecutors from Att'y Gen. (May 19, 2010), attached hereto as Ex. A. This policy rejects a blind adherence to a guideline sentence. Instead, it sets out a policy anchored in the notion that "equal justice depends on individualized justice." *Id.* at 1. The policy acknowledges that generally prosecutors will advocate for a sentence within a guideline range. However, the policy seeks advocacy at sentencing that follows "from an individualized assessment of the facts and circumstances of each particular case." *Id.* at 3.

An individualized assessment of Mr. Bosch's circumstances reveal that a modest downward departure from the sentencing guidelines *and/or* a variance pursuant to § 3553 is appropriate. The distinction between "departure" and "variance" may seem to be one based on semantics. It is not. A "departure" occurs when a court lowers a defendant's sentence based on the Sentencing Guidelines. Whereas, a "variance" occurs when a court lowers a defendant's sentence based on factors found in 18 U.S.C. § 3553. *See generally United States v. Cortes-*

3

*Meza*, 411 Fed. App'x 284, 291 (11th Cir. 2011) (citing *United States v. Irizarry*, 458 F.3d 1208, 1211 (11th Cir. 2006)).

In this case, whether it is a departure, or a variance, or a combination of the two, the result should be the same: a two point base offense level reduction resulting in a net six month reduction in the defendant's Sentencing Guideline range.

## DOWNWARD DEPARTURE

Respectfully, this Court should depart from the advisory sentencing guidelines based on the substantial assistance provided by Mr. Bosch.  The government has indicated to the defense that it is deferring a decision to formally notify the Court of the defendant's substantial assistance.  While the defense strongly believes that a § 5K1.1 motion is warranted, the defense respects and accepts the government's decision to defer action pending Mr. Bosch's testimony at an upcoming trial scheduled before Judge Altonaga.  *See United States v. Yuri Sucart et al.*, 14-CR-20550-ALTONAGA at [D.E. 185] (setting a jury trial during the two-week trial period that begins April 6, 2015).

Without question, Mr. Bosch has provided "substantial assistance" to the government in the investigation or prosecution of other individuals.  He has done everything asked of him to date as more fully detailed below.  Frankly, this point is not in dispute.  It is further not in dispute that the Court can and should consider that assistance when fashioning an appropriate sentence.  Accordingly, the Court should consider Mr. Bosch's full and complete cooperation during the sentencing phase of this case.

## DOWNWARD VARIANCE BASED ON § 3553 FACTORS

It is important that a sentencing court must not presume that the guideline range is reasonable but must instead make an individualized assessment based on the facts presented.

*Gall*, 552 U.S. at 51. "There are . . . many instances where the Guideline range will not yield a reasonable sentence." *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006); *see also Nelson v. United States*, 555 U.S. 350, 351 (2007) (holding that the Guidelines are not only not mandatory on sentencing courts; they are not presumed reasonable).

Post *Booker*, the Eleventh Circuit has affirmed numerous below guideline sentences even without the presence of a defendant's cooperation or a § 5K1.1 motion. *See United States v. Williams*, 435 F.3d 1350 (11th Cir. 2006) (affirming a 90 month sentence to be sufficient but not greater than necessary to punish even though the low end of the guidelines was 188 months). Indeed, it is the sentencing court's duty to make its own reasonable application of the § 3553(a) factors, and to reject the advice of the Guidelines if, after due consideration, the result they suggest does not comport with the sentencing court's view of an appropriate sentence. *Kimbrough*, 553 U.S. at 133 (Scalia, J., concurring).

Even without the filing of a § 5K1.1 motion, this Court is not precluded from considering Mr. Bosch's cooperation under § 3553(a). *See United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014) (holding that a sentencing court "has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a § 5K1.1 motion" and joining other circuits in holding that "a sentencing court's failure to recognize its discretion to consider a defendant's cooperation under § 3553(a)(1) is a significant procedural error"); *see also United States v. Landrón–Class*, 696 F.3d 62, 78 (1st Cir. 2012) (affirming that the district court has the discretion to consider a defendant's cooperation absent a § 5K1.1 motion), *cert. denied* 133 S. Ct. 1621 (2013); *United States v. Masse*, 663 F.3d 852, 858 (6th Cir. 2011) (affirming that a district court "retains the discretion to take into account a defendant's cooperation as a § 3553(a) mitigating factor"); *United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011) ("A district

5

court may consider a defendant's cooperation with the government as a basis for a reduced sentence, even if the government has not made a § 5K1.1 or Rule 35 motion."); *United States v. Doe*, 398 F.3d 1254, 1260–61 (10th Cir. 2005) (same).

Here, the individual facts concerning the history, characteristics, and cooperation of Mr. Bosch and the nature of the offense demonstrate that the general rules of sentencing within the calculated guideline range is inappropriate as it will not serve the ends of individualized justice. The individualized facts and the Court's own reasonable application of the § 3553(a) factors demonstrate that a modest variance of 6 months below the Guideline range is reasonable.

A minor variance is further warranted as a result of the unique circumstances of Mr. Bosch's Court-ordered drug rehabilitation.  Because of the intense, aggressive, near-custodial status of his drug therapy as more fully described below, a two point variance and or departure is warranted.

## MEMORANDUM IN SUPPORT OF DEPARTURE/VARIANCE AND IN AID OF SENTENCING

Mr. Bosch stands before the Court having pled guilty to distribution of testosterone.  He understands that he has committed a crime.  He takes complete responsibility for his conduct. Mr. Bosch's letter to the United States Probation Department accepting responsibility for his conduct is set forth as follows:

> I took the first steps towards accepting responsibility for my action when I agreed to cooperate with Major League Baseball.  This assistance was two-fold: 1. To determine the use of performance enhancing substances by Major League Baseball players and 2. To assist Major League Baseball in determining the flaws in their current drug testing program. . . . Through my attorneys, I contacted the U.S. Attorney's Office and informed them of my willingness to cooperate with their ongoing investigation.  I began cooperating with the U.S. Attorney's office in February or March 2014.

> I deeply regret the circumstances surrounding my arrest and subsequent bond revocation . . . .  I accept responsibility for all my actions as outlined in the factual proffer and incorporated by reference herein.
>
> I am striving to learn from my mistakes and am firmly committed to avoiding violations of law in the future.

Jan. 30, 2015 letter, attached hereto as Ex. B.

<u>**SECTION 3553(A) FACTORS**</u>

As set forth in the Plea Agreement the government has agreed to seek a sentence for Mr. Bosch at the low-end of the guidelines range.  [D.E. 2 at ¶6].  However, a reasonable application of the factors set forth in 18 U.S.C. § 3553(a) supports the granting of a modest downward variance and a sentence for Mr. Bosch below the low-end of the current guidelines range.

The factors set forth in § 3553(a) include, in relevant part: (1) the history and characteristics of the offender, (2) the nature and circumstances of the offense, (3) the need to provide just punishment and adequate deterrence; and (4) the need to avoid unwarranted sentencing disparities between defendants with similar records who have been found guilty of similar conduct.

**I.**   <u>**Behavioral History of Anthony Bosch**</u>

The Court is required to consider Mr. Bosch's entire background under § 3553(a)(1) including his post-offense conduct to inform its evaluation of his history and characteristics.  Here, the extent and nature of Mr. Bosch's post offense conduct—specifically, his cooperation—is an important factor in this Court's consideration.  Mr. Bosch's cooperation has not only been helpful to the government's investigations, but he has also been helpful to other agencies and entities, including an investigation conducted by Major League Baseball ("MLB").

### A.    Cooperation with MLB

In June 2013, Mr. Bosch began cooperating with the MLB's investigation of the use of performance-enhancing drugs by Major League and Minor League players.   Mr. Bosch's cooperation with MLB is outlined in a January 23, 2014 letter from MLB to the United States Attorney's Office ("USAO").  *See* Jan. 23, 2014 letter, attached hereto as Ex. C.

Mr. Bosch agreed to provide documents to MLB and participate in proffer sessions with MLB representatives to fully and truthfully answer any and all questions regarding the acquisition, possession, and use of the performance-enhancing drugs.  *Id.* at 3.  In fact, MLB has recognized that Mr. Bosch's full and complete cooperation provided "invaluable assistance" in addressing and eliminating the problems associated with performance-enhancing drugs.  *Id.* ("[W]e believe that Bosch fully performed his obligations under the cooperation agreement."). Mr. Bosch's cooperation was "critical to MLB's efforts to successfully sanction fourteen MLB players" and was described as significant to "important public interest."  *Id.* at 1-2.

On July 22, 2013, based on the information provided by Mr. Bosch, MLB announced the suspension of one of its Major League players, who agreed to accept a suspension of sixty-five games rather than challenge the evidence obtained by MLB from Mr. Bosch.  *Id.* at 4.  One month later, MLB announced the fifty-game suspension of twelve additional players who also agreed to accept their discipline without challenging MLB's evidence in an arbitration hearing. *Id.*   One player, however, challenged the MLB's decision to suspend that player for the remainder of the 2013 season and the 2014 season.  *Id.*   Bosch agreed to testify at this player's arbitration without receiving any monetary compensation from MLB.  *Id.*

Bosch testified over the course of five days during the arbitration – September 30, and October 1, 2, 3, and 4, 2013 – providing "substantial and essential information."  *Id.  But for*

Bosch's cooperation and testimony, which the arbitrator found to be credible and forthright, MLB would not have sustained the lengthy suspension of the player.  *Id.*; *see also* Panel Decision No. 131 at 23 (Jan. 11, 2014), attached hereto as Ex. D ("In this case, the testimony under oath from Bosch . . . was direct, credible, and squarely corroborated by experts . . . ."). Notably, Mr. Bosch did not assert his rights against self-incrimination in describing his dealings with MLB players.  Mr. Bosch's ownership of his actions and willingness to cooperate continued throughout the MLB's investigation and carried into his cooperation with the government.

### B.    Cooperation with the Government

Following MLB's investigation, Mr. Bosch was approached by the Drug Enforcement Administration ("DEA") and USAO in or about January 2014 and began cooperating in or about February or March 2014.  Notably, six months prior to beginning his cooperation, Mr. Bosch, through counsel, contacted the government to offer his information and cooperation.  *See* June 10, 2013 letter, attached hereto as Ex. E ("Mr. Bosch has information regarding the manufacture and distribution of anabolic steroids that he is interested in conveying to the government.").

In or around February 2014, when the DEA approached Mr. Bosch about his conduct, he made no pretense of innocence, nor did he minimize his actions.  Rather, Mr. Bosch immediately agreed to fully and completely cooperate.

### i.    *Threats and Endangerment*

Mr. Bosch agreed to cooperate with the complete awareness and understanding that cooperating in such an extensive capacity would result in placing the safety of both his and his loved ones in jeopardy.  Mr. Bosch received threats to induce him to lie about his relationships. *See* Ex. C at 5.  For example, Mr. Bosch was warned that if he contacted one player directly "there would be consequences."  *Id.* at 2.  The same player's associates also attempted to

9

pressure Mr. Bosch into signing a false affidavit denying any involvement in or knowledge of the player's use of performance-enhancing drugs.  *Id.*  They also sought to bribe Mr. Bosch to leave the country and "lay low" or "go underground."  *Id.*

After MLB announced the suspension of this MLB player, the player continued in his efforts to obstruct the due administration of justice.  For example, a very public campaign was mounted to impugn Mr. Bosch's credibility and character.  The authorities were urged to arrest Mr. Bosch so that he would be unavailable to testify at the arbitration.  This was all done, of course, to prevent the MLB and law enforcement authorities from relying on Mr. Bosch's information of illegal conduct of the player and his associates.

Throughout the past year, Mr. Bosch was forced to maintain security, who was then required to take protective measures.  Each time, Mr. Bosch was forced to abruptly end his current activity or engagement and quickly leave the area.  Too often, Mr. Bosch was personally confronted and even followed by unidentified vehicles.  Occasionally, the security detail took extreme measures to evade these individuals.

It became necessary to move Mr. Bosch from hotel to hotel at times. Individuals would watch Mr. Bosch and his family.  As a result, the strain and stress on Mr. Bosch and his family has been relentless.

   ii.  *Debriefings*

Mr. Bosch has met on numerous occasions with representatives of the USAO and the DEA.  He has spent scores of hours answering questions and supplying information on a variety of subjects of interest to the government.  Each time he provided truthful, complete, and reliable information.   He has identified documents and witnesses critical to the government's investigation.

**Lewis Tein** PL
ATTORNEYS AT LAW

3059 Grand Avenue, Suite 340, Coconut Grove, Florida 33133

### iii.      *Grand Jury Testimony*

Mr. Bosch has testified fully and completely before a Federal Grand Jury.   The government has indicated that his testimony was honest, truthful, and complete.  His testimony was used to secure indictments against multiple individuals.

### iv.      *Results of Mr. Bosch's Cooperation with the Government*

As a result of Mr. Bosch's cooperation, at least two separate federal indictments have been returned charging seven individuals with federal crimes.  *See United States v. Yuri Sucart, et al.*, Case No. 14-Cr-20550- ALTONAGA; *United States v. Carlos Acevedo*, Case No. 14-Cr-20556-GAYLES.  Mr. Bosch was listed as a witness in each of the charged cases.  Five of those individuals have pled guilty.  Only two remain and are currently pending trial.  Mr. Bosch plans to testify in *Sucart* as a government witness.  Indeed, Mr. Bosch stands ready, willing and able to assist in any and all matters.

### v.      *Government's Recognition of Mr. Bosch's Cooperation*

The government has recognized repeatedly that Mr. Bosch's cooperation has been significant and important.  Recently, in agreeing to reinstate Mr. Bosch's bond, the government stated to the Court on October 16, 2014, the following:

> The other interest that the government has is that defendants who enter into plea agreements with the government faithfully comply with the conditions of those plea agreements. On that score, this defendant has done that. We have no reason to complain or criticize anything that Mr. Bosch has done in faithfully meeting with us timely numerous times, sometimes in out-of-the-way places, sometimes on short notice. . . . [W]e have been quite satisfied with his compliance with what he promised to do in the plea agreement.

Bond Hr'g. Tr. 10:4-17 (Oct. 16, 2014) [D.E. 35].

## II.  **Personal History and Characteristics of Anthony Bosch**

In addition to Mr. Bosch's post offense conduct, Mr. Bosch's entire background including his criminal history, age, education, employment history, family ties, and commitment to community reveals Mr. Bosch to be a first time offender, a good son, a loving father to his children, and respected member of the community.

Mr. Bosch is 51 years old.  He was born in Queens, New York, to the marital union of Pedro Publio Bosch and Stella Banos.  Mr. Bosch's parents are naturalized United States citizens.  His father was born in Cuba, while his mother was born in Colombia.  His parents began medical school in Cuba but were unable to complete their studies.  They would later immigrate to the United States and reside in New York.

At one point during his early childhood, Mr. Bosch's parents were accepted into medical school in Madrid, Spain.  Shortly after completing their medical training in Spain and returning to New York, Mr. Bosch's parents were accepted to participate in an internal medicine residency program in Miami, Florida.  As a result, Mr. Bosch, his parents, and his two siblings moved to Miami, Florida.

Mr. Bosch graduated from Christopher Columbus High School in 1981.  He played high school baseball for four years and played two years of college baseball.  He played baseball and studied at Belmont Abbey College from 1981 to 1982 and at Catawba College from 1982 to 1983.  From 1983 to 1984, Mr. Bosch studied medicine at La Universidad Central de Este, in San Pedro de Macoris, Dominican Republic.  In 1985, Mr. Bosch completed his studies at Miami-Dade College and obtained his degree in respiratory care before resuming his medical studies outside of the United States.  From 2003 until his graduation in June 2007, Mr. Bosch

attended Belize Medical College, which is also known as Central America Health Science University.

It is the lesser known acts of kindness and consideration that demonstrate the man that stands before this Court for sentencing.  For instance, while studying in Belize, Mr. Bosch was part of a missionary team that regularly went into the jungle for days at a time to provide healthcare to children and adults who had no medical care.  Malnutrition was one of the main challenges in the region and it sparked Bosch's interest in nutrition.  During his last two years of medical school, Mr. Bosch also performed clinical studies at a medical facility in El Paso, Texas.

In 2007, Mr. Bosch graduated from Belize Medical College with a doctor of medicine degree.  After graduating, he assisted in teaching several courses at the college.



Diploma, attached hereto as Ex. F.

In addition to the selflessness that he exhibited in medical school, Mr. Bosch's circle of family and friends will attest to his willingness to provide any assistance to those in need. *See* Letters of Support from Friends, attached hereto as Composite Ex. G. Mr. Bosch is described as an "outstanding, honest, and dependable friend" and the "type of older brother that" others wish they could have. Ex. G-1; Ex. G-2. "It was not uncommon to see Mr. Bosch go out of his way to ensure that his neighbor[s], acquaintance[s], or friends have his support and assistance in whatever way necessary." Ex. G-3

Growing up, Mr. Bosch was among the oldest of the neighborhood children. "[N]aturally he took care of [them] a lot." Ex. G-4. One of Mr. Julio Rodriguez' earliest memories of Mr. Bosch involved laughing a lot and "feeling safe." *Id.* Mr. Bosch "never made [the other neighborhood children] feel like [they] were a burden to him." *Id.* Mr. Bosch's "humor and willingness to spend time with" them was a "very comforting part" of Mr. Rodriguez' youth. *Id.*

Another instance of Mr. Bosch's selfless giving involved a long-time friend, Mr. Hector Rivero. Almost ten years ago, Mr. Rivero ran into some financial troubles with his business and decided to ask his friend, Mr. Bosch, for a loan. Ex. G-5. Mr. Bosch did not hesitate to provide. Mr. Bosch also never let Mr. Rivero pay him back. *Id.* Rather, Mr. Bosch continues to refer business to Mr. Rivero. *Id.* Mr. Bosch has also never hesitated to open his home to friends and extended family members that were relocating to South Florida or otherwise needed a temporary place to stay. Ex. G-6.

Lastly, Mr. Bosch is respected and loved by his family. *See* Letters of Support from Family, attached hereto as Composite Ex. H. He and his parents maintain a good relationship. His siblings and children remain supportive of Mr. Bosch.

14

For instance, Danielle Bosch, Mr. Bosch's oldest daughter, describes her father as "loving" "involved," "supportive," and "an amazing grandfather" to her two children.  Ex. H-1. She has known her father to be a "very strong person but at the same time a very gentle human being who has never intentionally hurt another." *Id.*  After Mr. Bosch committed to substance abuse counseling, Danielle has "seen a huge difference in his attitude and his actions." *Id.*  Mr. Bosch has discussed his prior actions with Danielle and expressed that "he is extremely regretful." *Id.*

United States District Judge Rakoff eloquently summed up the delicate balance of weighing the good with the bad when evaluating a man's life within the context of his history and characteristics:

> As these examples attest, [the Defendant's] good deeds were not performed to gain status to enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).  Like the defendant in *Adelson*, Mr. Bosch's good deeds were not done to enhance his self image.  To the contrary, Mr. Bosch's commitment to providing healthcare to the less fortunate individuals in the jungles of Belize and financial and emotional support to his friends and family was quietly and selflessly done.  This commitment speaks loudly on behalf of the good that is Mr. Bosch and the meaningful contributions he has and will continue to make to society.

15

III.     **Nature and Circumstances of the Offense**

Mr. Bosch acknowledges in his Plea Agreement and Factual Proffer that his offense results from his participation in a conspiracy to distribute testosterone.  Indeed, Mr. Bosch's Factual Proffer and the revised Presentence Investigation Report ("PSI") dated February 12, 2015 are comprehensive and detail the nature and circumstances of the offense.  Please allow us, however, to provide additional detail regarding two separate topics – (1) the consultations with high school athletes and (2) the 2011 Dominican Republic business venture.

A.     **Consultations with High School Athletes**

Consistent with Mr. Bosch's truthful and forthright acceptance of responsibility, Mr. Bosch has admitted that he treated a number of young men over the course of several years. They would visit his business and consult with him about the goals they wanted to achieve. Accordingly, in his plea agreement, Mr. Bosch agreed to a two-level increase to his base offense level "for having distributed a controlled substance to an individual that he knew was less than 18 years of age," pursuant to § 2D1.1(b).

Notably, the factual proffer and the PSI also recognize that these young men were almost always accompanied by their parents.  PSI, ¶ 18 [D.E. 49]; Factual Proffer, ¶ 3 [D.E. 3] (noting that these individuals were usually accompanied by their parents).  This fact is important and should not be overlooked.  All other factors aside, Mr. Bosch adhered to the general practices and procedures regarding the medical consultation and treatment of minors.  *See* Maureen Carroll, *Transgender Youth, Adolescent Decisionmaking, and Roper v. Simmons*, 56 UCLA L. REV. 725, 738-39 (2009) ("Because minors are considered unable to consent on their own behalf, the general rule is that they must obtain parental consent for medical care.").  It was never his

intent to harm any of these young men at any time.  Importantly, the PSI recognizes that there are neither victims nor injuries as a result of this conduct.

Respectfully, the evidence in this case would support this fact and reveal that the parents of these young men paid for and received treatment.  They were generally recruited by coaches, and others, and brought to Mr. Bosch by their parents over the course of several years.  Many were already using performance enhancing medicines in excess and unsupervised, a practice Bosch urged them to cease.

### B.      Business Venture in the Dominican Republic

Mr. Bosch does not contest that he worked with Yuri Sucart and Carlos Acevedo in a joint business venture for the legitimate purpose of supporting young athletes in the Dominican Republic in hopes that these athletes would be drafted in the June Amateur Baseball Draft.  Mr. Bosch assisted in obtaining letters that allowed Mr. Sucart and Mr. Acevedo to travel with testosterone to the Dominican Republic, a country where testosterone can be purchased legally and over-the-counter without a prescription.

It is also important to note that Mr. Bosch's participation in this venture was very limited. Mr. Bosch never invested in the business.  Mr. Acevedo was the sole investor.  Mr. Bosch never met with nor consulted with any of the baseball prospects in the Dominican Republic.  Mr. Bosch never administered testosterone to any of the Dominican Republic baseball prospects.

In truth, this venture was ill-advised, misguided, and temporary.  The activities that occurred in the Dominican Republic happened over a brief period of time – approximately 30-90 days.  Finally, and maybe most critically, it is again important to note that the revised PSI makes clear that there were no identifiable victims at anytime during the offense conduct, which includes events in the U.S. and abroad.  PSI, ¶ 39.

17

**Lewis Tein** PL
ATTORNEYS AT LAW

3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

IV.     **Just Punishment and Adequate Deterrence**

Careful balance between just punishment and adequate deterrence would not be served by a lengthy incarceration of Mr. Bosch. The U.S. Probation Office, in its revised PSI, has determined Mr. Bosch's sentencing guideline range to be 41 to 51 months. Here, a sentence below the low-end of the guidelines would reflect a proper balance between just punishment and adequate deterrence.

Clearly, incarceration serves the dual purpose of retribution and deterrence. But Mr. Bosch has shown since the first day he became aware of the government's investigation of his conduct that he can be a contributing member of society.

A.     **Substance Abuse Treatment**

As this Court is well aware, Mr. Bosch began the first phase of his treatment to address his substance abuse issues on October 16, 2014. During this phase Mr. Bosch participated in an evaluation process, which included the admission process, nursing assessment, history and physical, bio-psychosocial interview, nutritional assessment, and family assessment. *See* Oct. 30, 2014 letter (filed under seal). His treatment consisted of group therapy, individual therapy, recreation therapy, and lectures addressing relapse triggers and prevention. He also faithfully attended in-house AA/NA 12-step meetings. With the assistance of the facility's staff, Mr. Bosch developed individualized treatment goals. He complied with all the rules of the facility and attended all scheduled activities as a full participant. During treatment, Mr. Bosch was also subjected to random drug screenings. Each drug screen was negative for all substances.

On November 18, 2014, Mr. Bosch began the second phase of his substance abuse treatment and has remained at that facility to date. *See* Feb. 12, 2015 letter (filed under seal). The treatment program at this facility is focused on "confront[ing] the various distorted attitudes,

**Lewis Tein** PL
ATTORNEYS AT LAW
3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

beliefs, and behaviors which fuel [a] patient's pathology." The treatment is also "highly structured, rigorous, confrontive (when appropriate), individualized, and clinically demanding." Mr. Bosch was placed in the "intensive residential rehabilitation component" where his stay at this level was anticipated to last at least "four months." Thereafter, the facility recommends a transition to "transitional living program[s]" and "working or volunteering" while continuing to participate in intensive outpatient services.

Currently, Mr. Bosch has a 12-step sponsor and "has begun taking ownership for the problems in his life." His therapist and counselor have reported that Mr. Bosch is "holding himself accountable for his actions" and he "seems genuinely motivated to make amends for his past actions." To date, Mr. Bosch has completed all assignments and his attitude and motivation have significantly improved. Mr. Bosch's progress has also led to successful family workshops which gave the Bosch family the opportunity to participate in his rehabilitation. Although "genuine progress" has been made, there is "significant work left to do." Mr. Bosch's completed treatment plan includes a long-term/extended care program. His therapist genuinely feels that Mr. Bosch can and should continue his treatment for this extended period.

For the past four months Mr. Bosch has been fully immersed and on virtual lockdown in his highly structured, rigorous, intensive, and clinically demanding therapy. His progress is significant. His therapist are optimistic. His family notes substantial improvement. Accordingly, a minor variance is warranted.

### B. Continued Cooperation with Third-Parties

While working with the government to aid in its investigation and prosecution of others, Mr. Bosch remained willing but unable to cooperate and volunteer with other entities, such as the United States Anti-Doping Agency ("USADA"). By way of background, USADA is an

independent not-for-profit entity that is recognized by the United States Congress as the official anti-doping agency for the Olympic and Paralympic Movements in the United States.  As the designated National Anti-Doping Organization ("NADO") in the United States, USADA is tasked with, and has embraced, the responsibility of testing for banned substances and the investigation and adjudication of anti-doping rule violations by athletes and athlete support personnel (coaches, trainers, doctors, etc.) in Olympic and Paralympic sport.

Through Mr. Bosch's attorneys, USADA learned that Mr. Bosch possessed relevant and important information on a range of issues that are of great interest to USADA.  Out of deference to the U.S. Attorney's Office's investigation and prosecution, USADA delayed its efforts to obtain Mr. Bosch's complete cooperation.  Now that Mr. Bosch's case is reaching its conclusion, however, USADA is eager to meet with Mr. Bosch and speak with him directly about cooperating with its ongoing inquiries.

USADA is now seeking this Court's consent for Mr. Bosch to cooperate in the investigation of the use of performance-enhancing drugs in Olympic and Paralympic sport.  Mr. Bosch is more than willing to share his extensive knowledge of methods and practices with USADA and welcomes the prospect of having such cooperation made a formal requirement of his sentence.  USADA is confident that such an arrangement would help USADA continue to fulfill its mission to preserve the integrity of competition, inspire true sport, and protect the rights of U.S. athletes.  USADA is also confident that such an arrangement would benefit Mr. Bosch by providing him with a meaningful opportunity to continue to make amends.

Volunteer work combined with outpatient treatment is consistent with the recommendation for Mr. Bosch's transition from his residential treatment program.

Lewis Tein PL
ATTORNEYS AT LAW

3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

## V.     Similarly Situated Defendants

Section 3553(a)(6) very clearly speaks to the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   The following information includes the sentences issued in cases that are directly related to Mr. Bosch's case, as well as sentences issued to defendants who have been found guilty of similar conduct.

### A.     Related Cases

Seven individuals that are related to Mr. Bosch's case have been charged or indicted for similar conduct.  *See United States v. Yuri Sucart et al.*, Case No. 14-CR-20550-ALTONAGA (naming Yuri Sucart, Jorge "Ugi" Velazquez, Christopher Engroba, Juan Carlos Nunez, Lazaro Collazo, and Paulo Berejuk as defendants); *see also United States v. Carlos Acevedo*, Case No. 14-CR-20556-GAYLES.  Of the seven defendants, five have pled guilty.  To date, three of the five defendants have received sentence ranging from two-years of probation to 42 months imprisonment.

### i.     *United States v. Yuri Sucart et al.*, Case No. 14-CR-20550-ALTONAGA

Identical to Mr. Bosch's plea, Mr. Engroba, Mr. Velazquez, Mr. Berejuk, and Mr. Nunez pled guilty to one count of conspiracy to distribute a Schedule III controlled substance, to wit: testosterone.  Mr. Berejuk and Mr. Nunez are awaiting their sentencing before Judge Altonga, while the remaining co-conspirators, Yuri Sucart and Lazaro Collazo, are awaiting trial before this Court.

Of the two defendants that have received their sentence, Mr. Engroba agreed to cooperate and was sentenced to two years of probation.  Mr. Velazquez, on the other hand, obstructed justice, decided not to cooperate, and was sentenced to 30 months imprisonment.

**Lewis Tein** PL
ATTORNEYS AT LAW
3059 Grand Avenue, Suite 340, Coconut Grove, Florida 33133

ii.    *United States v. Carlos Acevedo*, Case No. 14-CR-20556-GAYLES

Similar (but not identical) to Mr. Bosch's plea, Mr. Acevedo pled guilty to two counts – (1) conspiracy to distribute testosterone and (2) conspiracy to distribute a Schedule I controlled substance.  On January 16, 2015, Mr. Acevedo was sentenced to 42 months imprisonment as to each of the counts, to be served concurrently.  Two of the three factors that this Court considered and expressly announced as factors in determining the severity of Mr. Acevedo's sentence are undisputedly absent from Mr. Bosch's case.  This sentence was imposed, in part, because "there were two different types of drug transactions" and because "Mr. Acevedo has a prior conviction."  Acevedo Sentencing Hr'g. Tr. 36:11-20 (Jan. 16, 2015).

Mr. Bosch's record and conduct are distinguishable from that of Mr. Velazquez's and Mr. Acevedo's.  First, unlike Mr. Acevedo, Mr. Bosch has no prior criminal history.  *See* PSI, ¶ 57-59 (indicating no juvenile or adult criminal convictions and "zero criminal history points").  Also unlike Mr. Acevedo, Mr. Bosch was not charged nor pled guilty to a crime that involved two different types of drug transactions.  Finally, unlike Mr. Velazquez, Mr. Bosch has and will continue to cooperate, and Mr. Bosch has not obstructed justice.  Rather, Mr. Bosch's record and conduct is similar to Mr. Engroba's.  Respectfully, to avoid unwarranted sentence disparities Mr. Bosch's sentence should be more similar to that of Mr. Engroba.

| Defendant | Cooperation | Obstructed Justice | Additional Charges | Guideline Range | Sentence |
|---|---|---|---|---|---|
| Jorge Velazquez | No | Yes | No | 30 – 37 months | 30 months imprisonment |
| Carlos Acevedo | Yes | No | Yes | 37 – 46 months | 42 months imprisonment |
| Christopher Engroba | Yes | No | No | 10 – 16 months | 2 years probation |
| Anthony Bosch | Yes | No | No | 41 – 51 months | |

### B.     Other Cases

While the case law is sparse in regards to the charges at hand there are some cases that can provide persuasive insight to how other defendants similarly situated were sentenced and what factors the court in those cases took into consideration when determining the appropriate terms.

i.     <u>*United States v. Conte*, Case No. CR04-44 & CR05-455 (N.D.Cal) &</u>
<u>*United States v. Shortt*, 485 F.3d 243 (4th Cir. 2007)</u>

*United States v. Conte*, or more infamously known as the case concerning the Barry Bonds Scandal, is a ripe example.  In *Conte*, Victor Conte, the vice-president of the Bay-Area Laboratory Co-operative ("BALCO"), took timely responsibility for his actions and pled guilty to illegal steroid distribution and money laundering.  He received an enhancement for being the leader and organizer of the crime.  In addition to treating Barry Bonds, a famous professional baseball player, Conte treated numerous other high profile athletes including, MLB players, Olympic athletes (separate individuals and the entire 1988 U.S. judo team), boxers, and cyclists. Conte marketed tetrahydroestrinone, also known as "The Clear," as a performance enhancing drug undetectable to tests and screenings.  The judge sentenced Conte to 4 months prison followed by 4 months of home detention.

The scale of Conte's scheme far surpasses this case. No case is more infamous than that of the steroid distribution ring that led to nationally beloved baseball hero Barry Bonds falling from grace.  While Mr. Bosch's case presents a crime that implemented a significantly smaller scale than *Conte*, there are some important similarities.  Like Conte, Mr. Bosch has received an enhancement for being the leader and organizer of the crime.  Even though the amount of athletes affected in *Conte* far exceeds Mr. Bosch, both Conte and Mr. Bosch did treat

23

**Lewis Tein** PL
ATTORNEYS AT LAW

3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

professional athletes. Both Conte and Mr. Bosch reflected and have expressed sincere remorse for their actions, and have attempted to take responsibility for what has occurred. Conte has attempted to make amends through his expressed remorse, and Mr. Bosch has done so not only through his expressed remorse but also his substantial cooperation with the government.

In *United States v. Shortt*, 485 F.3d 243 (4th Cir. 2007), a licensed physician, James Shortt, was found guilty of conspiracy to dispense anabolic steroids and human growth hormone. Shortt treated many professional athletes but was never remorseful for his actions, even maintaining at sentencing that the drugs he dispensed to his clients were aimed to aid the repair of the athletes' bodies. In deciding the sentence, the judge gave weight to the fact that the defendant tried to conceal his wrongdoing from authorities by circumventing the testing procedures of the professional sports leagues, expressing a lack of remorse for the crime, and treating minor children. The judge sentenced the physician to 12 months and 1 day of imprisonment.

The scheme in *Shortt* is similar to this case; however, the actions of the physician and Mr. Bosch are not. Both men knew the testing procedures of the professional leagues, both men treated numerous professional athletes and both men treated athletes who had not yet reached the age of majority. While both men are guilty of the same crime, only Mr. Bosch has taken responsibility for his actions. In fact the physician in *Shortt* made a statement to the court during sentencing expressing that this lack of remorse and equating the distribution of steroids to healing those he treated. The actions of the physician, paired with his flagrant irresponsibility and immaturity led to the judge imposing the sentence of 12 months and a day.

In *Conte*, like *Shortt*, we have very similar sets of facts to the case at bar, but we have two additional defendants who responded quite differently – in essence, the same crime, different

actions. The only apparent difference is the lack of responsibility and accountability taken by one

of the defendants.  In *Conte*, the defendant took responsibility for what he had done and as a

result the judge imposed a sentence of 4 months prison and 4 months house arrest.  In *Shortt*, the

defendant argued until the very end that what he did was not wrong and the judge imposed a

sentence of a year and a day.  Bosch's cooperation parallels the defendant in *Conte*.

| Defendant | Acceptance of Responsibility and Remorse | Guideline Range | Sentence |
|---|---|---|---|
| James Shortt | No | 0 – 6 months | 12 months and 1 day imprisonment |
| Victor Conte | Yes | 6 – 12 months *(based on 2005 USSG table and offense level of 10)* | 4 months imprisonment 4 months home detention |
| Anthony Bosch | Yes | 41 – 51 months | |

ii.　　*United States v. Del Toro et al.*, Case No. 11–80155–CR–MARRA
(S.D. Fla.)

United States v. Del Toro*, is another case that contains similar conduct that is instructive

in avoiding sentencing disparities for similar conduct.  Because *Del Toro* involved multiple

defendants, only the relevant offense conduct and related sentences are discussed below.

First, Mr. Jeffrey Perelman pled guilty to two counts of the Superseding Indictment –

conspiracy to distribute a controlled substance and conspiracy to unlawfully distribute human

growth hormone.  Specifically, between March 2007 and July 2011, Mr. Perelman caused

96,740,768 dosage units of anabolic steroids to be dispensed through pharmacies to customers of

various medical clinics.  Before the indictment, Mr. Perelman cooperated with the government

by providing detailed information about other government targets.   At sentencing, Mr.

Perelman's PSI reflected a range of 30-37 months imprisonment.  The judge sentenced Mr.

Perelman to 6 months imprisonment on both counts to be served concurrently and followed by

25

**Lewis Tein** PL
ATTORNEYS AT LAW

3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

one year of supervised release with 4 months of home confinement.

Additionally, Mr. Steven Pearlstein pled guilty to three counts of the Second Superseding Indictment – (1) conspiracy to distribute a controlled substance, to wit: anabolic steroids; (2) conspiracy to distribute controlled substance, to wit: oxycodone; and (3) conspiracy to unlawfully distribute human growth hormone.  From August 2006 through March 2009 and from July 2010 through July 2011, Pearlstein pre-signed blank prescription pads that were used to create drug orders for steroids, oxycodone, and human growth hormone for a clinic owned by Craig Beaver.  Before the indictment, Mr. Pearlstein sat for interviews with the government and prepared to appear as a witness at trial.  During his debriefings Pearlstein provided detailed descriptions of his interactions with individuals who were targets of the government's investigation. At sentencing, Mr. Pearlstein's PSI provided a guideline range of 135 to 168 months.  The judge sentenced Mr. Pearlstein to 12 months and 1 day followed by one year of supervised release.

Mr. Craig Beaver, the clinic owner and a licensed chiropractor, also pled to the same charges as Mr. Pearlstein and also cooperated with the government in their investigation before being charged by the Indictment.  At sentencing, Mr. Beaver's PSI provided a guideline range of 188 to 235 months.  The judge sentenced Mr. Beaver to 18 months imprisonment followed by one year of supervised release and 6 months of home detention.

Finally, Alan Lefkin, a licensed medical doctor who also worked for Mr. Beaver, pled guilty to two counts—conspiracy to distribute anabolic steroids and conspiracy to unlawfully distribute human growth hormone.  Identical to Mr. Perelman, Mr. Pearlstein, and Mr. Beaver, Mr. Lefkin cooperated with the government before being charged in the indictment.  Mr. Lefkin's PSI provided a guideline range of 24 to 30 months.  The judge sentenced Mr. Lefkin to

3 months imprisonment followed by one year of supervised release with 3 months of home confinement.

Each defendant was charged with and pled guilty to the same crime as Mr. Bosch. Notably, most of the defendants were charged with and pled guilty to additional crimes. Each of these defendants cooperated with the government's investigation prior to being charged in an Indictment. Each of these defendants received a sentence that was a fraction (approximately 10%) of their recommended sentence. Respectfully, these cases provide fair guidance.

| Defendant | Cooperation | Additional Charge | Guideline Range | Sentence | % of low-end Guideline Range |
|-----------|-------------|-------------------|-----------------|----------|------------------------------|
| Jeffrey Perelman | Yes | Yes | 30-37 months | 6 months imprisonment 4 months home detention | 20% |
| Steven Pearlstein | Yes | Yes | 135 to 168 months | 12 months and 1 day imprisonment | 8.8% |
| Craig Beaver | Yes | Yes | 188 to 235 months | 18 months imprisonment 6 months home detention | 9.5% |
| Alan Lefkin | Yes | Yes | 24 to 30 months | 3 months imprisonment 3 months home detention | 12.5% |
| Anthony Bosch | Yes | No | 41 – 51 months | | |

## CONCLUSION

Mr. Bosch is truly repentant. He deeply regrets agreeing to and participating in the conspiracy to distribute testosterone. He has learned from this experience. Mr. Bosch understands that he must stand accountable for his conduct and accept the consequences, which include the possibility of serving a term of imprisonment. Here, a two point base offense level reduction resulting in a mere net six month reduction in the low end of the Guideline range is fair and appropriate. Such sentence is consistent with the factors mandated by 18 U.S.C. § 3553(a).

### MR. BOSCH'S UNOPPOSED REQUEST FOR VOLUNTARY SURRENDER, RESIDENTIAL DRUG TREATMENT PROGRAM, AND INSTITUTIONAL RECOMMENDATION

**I.      Voluntary Surrender**

In the event that this Court sentences Mr. Bosch to a term of imprisonment, Mr. Bosch respectfully requests that he be permitted to voluntarily surrender to his designated place of incarceration.  The government has no objection to this request.

First, Mr. Bosch has cooperated with the government since he first learned of the investigation underlying this prosecution and the prosecution in *United States v. Carlos Acevedo*, Case No. 14-CR-20556-GAYLES and *United States v. Yuri Sucart et al.*, Case No. 14-CR-20550-ALTONAGA.  Second, during the pre-arrest phase, Mr. Bosch cooperated and met with the government and its agents.  Third, on the date of his first appearance, Mr. Bosch self-surrendered to authorities according to the date, time, and location agreed to by the government.  Fourth, Mr. Bosch has faithfully fulfilled the conditions of his pretrial release.  Finally, Mr. Bosch is scheduled to testify as a government witness in *Sucart*.

Allowing Mr. Bosch to voluntarily surrender after his testimony will allow him, his counsel, and the government the additional time and access to prepare for his testimony.  Lastly, allowing Mr. Bosch to voluntarily surrender is considered an important positive factor under the Bureau of Prisons Guidelines.  *See* BOP Inmate Security and Custody Classification, Po. No. P5100.008,  9/12/06  at  Ch.  4  p.  5-6,  Voluntary  Surrender  (available  at http://www.bop.gov/policy/progstat/5100_008.pdf).

In addition, Mr. Bosch's rehabilitation is ongoing.  *See supra* § IV(A).  He has paid for this treatment through the month of March and is dedicated and committed to a full recovery.  Indeed, his counselors confirm that there is significant work left to do.  As a result, Mr. Bosch

respectfully requests 60 days to voluntarily surrender so that he can receive as much therapy and treatment as possible before surrendering to the U.S. Marshalls.  Again, the government has no objection to this request.

## II.      Residential Drug Abuse Program

As acknowledged in paragraphs 76 through 81 of the revised PSI, Mr. Bosch has a substance abuse problem for which he is currently seeking treatment.  Accordingly, Mr. Bosch is eligible for the substance abuse treatment program, otherwise known as the Residential Drug Abuse Program ("RDAP") and noted in 18 U.S.C. § 3621(e).   In the event that this Court sentences Mr. Bosch to a term of imprisonment, Mr. Bosch respectfully requests that this Court recommend the program.  The government does not object.

## III.      Institutional Recommendation

In the event that this Court sentences Mr. Bosch to a term of imprisonment, Mr. Bosch respectfully requests that this Court submit a recommendation to the Bureau of Prisons that, if possible, Mr. Bosch should be assigned to FCI Miami or a facility within South Florida.  Mr. Bosch understands that the Court, if inclined to do so, can only recommend, rather than bind, the Bureau of Prisons as it relates to facility placement.

Case No. 14-20555-CR-GAYLES

Respectfully submitted,

LEWIS TEIN, P.L.
*Counsel for Anthony Bosch*
3059 Grand Avenue, Suite 340
Coconut Grove, Florida 33133
Tel: (305) 442 1101
Fax: (305) 442 6744

By:     */s/ Guy A. Lewis*
        GUY A. LEWIS
        Fla. Bar No. 623740
        lewis@lewistein.com
        MICHAEL R. TEIN
        Florida Bar No. 993522
        mtein@lewistein.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 12, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the following service list via transmission of Notices of Electronic Filing generated by CM/ECF.

        */s/ Guy A. Lewis*
        GUY A. LEWIS

## SERVICE LIST

Michael P. Sullivan, Esq.
U.S. Attorney's Office
99 N.E. 4th Street
Miami, Florida 33132

Sharad Anand Motiani, Esq.
United States Attorney's Office
99 NE 4th Street
Miami, FL 33132